IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| QUALITY SAUSAGE COMPANY, LLC, HM INTERNATIONAL LLC, GREGORY R. GEIB, AND KATHRYN M. GEIB,<br><br>*Plaintiffs*,<br><br>v.<br><br>TWIN CITY FIRE INSURANCE CO.<br><br>*Defendant*. | Case No. 4:17-cv-111<br>JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiffs Quality Sausage Company, LLC ("QSC"), HM International LLC, Gregory R. Geib ("Gregory Geib"), and Kathryn M. Geib ("Kathryn Geib") (collectively, "Plaintiffs") file this Complaint against Defendant Twin City Fire Insurance Co. ("Twin City" or "Defendant") and allege as follows:

## PARTIES

1.  Plaintiff QSC is a limited liability corporation organized under the laws of the State of Delaware and registered to do business in the State of Texas. Plaintiff QSC's principal place of business is 1925 Lone Star Drive, Dallas, Texas 75212.

2.  Plaintiff HMI is a limited liability corporation organized under the laws of the State of Oklahoma and registered to do business in the State of Texas. Plaintiff HMI's principal place of business is 5810 E Skelly Drive, Suite 1650, Tulsa, Oklahoma 74135.

3.  Plaintiff Gregory Geib is an individual and a resident of Texas, and lives at 3619 Nottingham Street, Houston, Texas.

1

4. Plaintiff Kathryn Geib is an individual and a resident of Texas, and lives at 3619 Nottingham Street, Houston, Texas.

5. Defendant Twin City is a company organized under the laws of the State of Indiana. Defendant Twin City's principal place of business is 501 Pennsylvania Parkway, Suite 400, Indianapolis, Indiana 46280. Defendant Twin City may be served with process by delivering a summons and a true and correct copy of this Complaint to its registered agent for receipt of service of process, CT Corporation System, 150 West Market Street, Suite 800, Indianapolis, Indiana 46204.

## JURISDICTION AND VENUE

6. This Court has personal jurisdiction over Defendant because Defendant has continuous and systematic business contacts within this District. Further, Defendant has purposefully availed itself of the laws of the State of Texas at least when Defendant entered into the contract for insurance in dispute with Plaintiff QSC in Houston, Texas.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs and Defendant are citizens of different States and the amount in controversy exceeds $75,000, excluding interest and costs.

8. Venue is proper in this District under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to Plaintiff QSC's claims occurred in this District, including delivery of the insurance policy at issue in this case.

## FACTUAL BACKGROUND

**A.   Plaintiff QSC's insurance policy with Defendant.**

9. Plaintiff QSC purchased an insurance policy listing Defendant as the insurer. Policy No. 61 KB 0287307 14 (the "Policy").

10. The Policy provided coverage from November 1, 2014 to November 1, 2015. Policy, Declarations at p. 1.

11. On or about November 5, 2014, the Policy was amended to include Plaintiff HMI as a subsidiary covered by the Policy. Policy, Endorsement No. 8 at p. 1.

12. The Policy includes a "Directors, Officers, and Entity Liability Coverage" Part (the "D&O Coverage Part") with an aggregate limit of liability of $3,000,000. Policy, Declarations at p. 2.

13. The D&O Coverage Part includes an Entity Liability insuring agreement. D&O Coverage Part at § I(C) (the "Entity Liability Agreement").

14. The Policy also includes a "Crime Coverage" Part (the "Crime Coverage Part").

15. The Crime Coverage Part includes a Computer and Funds Transfer insuring agreement with a limit of liability of $500,000. Crime Coverage Part at § I(E) (the "CFT Agreement"); Policy, Crime Coverage Part Declarations at p. 1.

16. Based on events including those outlined below, Plaintiff QSC has made claims under the Entity Liability Agreement of the D&O Policy and the CFT Agreement of the Crime Policy.

17. Defendant has denied all of Plaintiff QSC's claims.

**B.     Plaintiff HMI's business and its clients.**

18. Plaintiff HMI is a subsidiary of Plaintiff QSC and is covered under Plaintiff QSC's Policy.

19. Plaintiff HMI's officers include Tamara Rains ("Ms. Rains"), Plaintiff HMI's Vice President, Chief Administrative Officer, and Secretary.

20. Plaintiff HMI's clientele includes Plaintiffs Gregory and Kathryn Geib.

21. Plaintiff HMI provides Plaintiffs Gregory and Kathryn Geib with (1) accounting services, (2) assistance with state and federal income tax preparation and any income tax related filings, (3) assistance with procurement and maintenance of insurance policies, and (4) other services reasonably requested by the Geibs.

**C.    The transfer, discovery, investigation, and aftermath.**

22. On Monday, January 12, 2015, Ms. Rains received an email with the identified sender "Greg.Geib@windsorfoods.com" (the "Fraudulent Email").

23. The Fraudulent Email purported to instruct Plaintiff HMI to wire transfer $1,000,000 from Plaintiff Kathryn Geib's JPMorgan Chase bank account to a Bank of America bank account.

24. Based on the Fraudulent Email, Ms. Rains ordered a transfer of $1,000,000 from the JPMorgan Chase bank account to Amlear LLC via Bank of America bank account identified in the Fraudulent Email.

25. The JPMorgan Chase bank account is located in Phoenix, Arizona.

26. The Bank of America bank account identified in the Fraudulent Email was located in Greenville, South Carolina.

27. On January 14, 2015, Ms. Rains received another email request from "Greg.Geib@windsorfoods.com" to transfer money from the JPMorgan Chase bank account to a second Bank of America account.

28. Ms. Rains called Plaintiff Gregory Geib before initiating this transfer because the requested recipient was the same but the bank account was different from the one identified in the Fraudulent Email.

4

29. Plaintiff Gregory Geib first learned about the January 12, 2015 transfer from Ms. Rains through the January 14, 2015 phone call.

30. Plaintiff Gregory Geib told Ms. Rains that he did not instruct either transfer.

31. JPMorgan Chase was immediately contacted upon learning that the January 12, 2015 transfer was unauthorized. Upon information and belief, JP Morgan Chase then contacted Bank of America.

32. Plaintiffs learned that a large part of the $1,000,000 had been transferred to Singapore.

33. Upon information and belief, a police report was immediately filed with the authorities in Singapore.

34. Plaintiff Gregory Geib did not send the Fraudulent Email or instruct Plaintiff HMI to transfer the $1,000,000 from the JPMorgan Chase bank account. Instead, upon information and belief, an unknown hacker, using a "man-in-the-middle" scheme, sent the Fraudulent Email.

35. Plaintiff Kathryn Geib was able to recover approximately $90,000 from Bank of America.

36. Plaintiffs Gregory and Kathryn Geib received $200,000 total under a personal coverage plan with AIG.

37. Upon information and belief, authorities in Singapore have advised that they are currently holding approximately $351,506.36 in escrow while further investigating the theft. HMI and the Geibs have retained counsel in Singapore to seek recovery of any funds traceable to the theft. Upon information and belief, the US FBI is assisting the Singapore authorities in attempting to recover the stolen funds transferred to Singapore.

38.     Plaintiffs Gregory and Kathryn Geib have not yet recovered or otherwise received compensation for approximately $710,000.

**D.     Demand against Plaintiff HMI and Defendant's denial of coverage.**

39.     QSC notified its insurance broker about the January 12, 2015 fraudulent transfer detailed above. QSC demanded coverage under the Policy, including the D&O and Crime Coverage Parts.

40.     On or about January 20, 2015, Defendant acknowledged that the insurance broker had forwarded QSC's notice to Defendant, and that Defendant had received QSC's notice.

41.     On or about April 28, 2015, Plaintiff HMI received a demand letter from Todd Donohue of The Wolf Law Firm, P.C. (the "Demand Letter"). The Demand Letter explains that the Wolf Law Firm "has been retained to represent Mr. Greg Geib in connection with an unauthorized wire transfer of funds totaling $1,000,000.00 from Kathy Meinig Geib's JPMorgan Chase account . . . to a fraudulently-created Bank of America account in Greenville, South Carolina." The Demand Letter asserts that Plaintiff HMI "bears the responsibility for this loss" and formally demands compensation from Plaintiff HMI for the loss.

42.     On or about May 15, 2015, and based on the Demand Letter, Plaintiff HMI again contacted Defendant about these claims, explained that the claims are covered at least under the D&O Coverage Part, and demanded to know whether Defendant would address the Demand Letter and, if necessary, defend against it.

43.     On or about May 21, 2015, QSC received a response acknowledging its May 15, 2015 Letter.

44.     On or about October 1, 2015, QSC received a letter explaining that Defendant was denying coverage under the D&O coverage policy.

6

45. Following additional communications by Plaintiff HMI and its counsel, on or about December 16, 2015, Defendant's representative Mr. Knox responded again asserting that any claim under the D&O Coverage Part would be excluded under the professional services exclusion.

46. Despite providing further information as requested by Mr. Knox, Defendant has refused to accept liability under either the Crime Coverage Part or the D&O Coverage Part.

## CONDITIONS PRECEDENT

47. All conditions precedent to maintaining the causes of action below have been performed or have otherwise occurred.

## VICARIOUS LIABILITY

48. Wherever in this Complaint it is alleged that Defendant did any act or thing, it is meant that the Defendant's officers, agents, servants, employees or representatives did such act or thing that at the time such act or thing was done, it was done with the full authorization or ratification of the Defendant or was done in the normal and routine course and scope of employment of the Defendant's officers, agents, servants, employees, or representatives. Accordingly, Defendant is liable to Plaintiffs under the doctrines of respondeat superior, vicarious liability, and principal-agent.

## CAUSES OF ACTION

### I. Breach of Contract

49. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

50. Plaintiff QSC and Defendant entered into a binding contract for insurance — the Policy — and there existed a meeting of the minds as to the premiums to be paid by Plaintiff

QSC, and all actions to be taken upon suffering a covered loss, and the duties and obligations of Defendant toward Plaintiff QSC and the beneficiaries of the Policy.

51.     Plaintiff QSC notified Defendant of claims under the Policy's Entity Liability and CFT Agreements.

**A.     Plaintiffs QSC and HMI's claims under the D&O Coverage Part.**

52.     Plaintiff HMI denies any wrongdoing alleged in the April 28, 2015 Demand Letter from the Wolf Law Firm. However, under any determination of Plaintiff HMI's responsibility, at least one of the insuring agreements (e.g., the Entity Liability Agreement and CFT Agreement) covers one or more of Plaintiffs' claims.

53.     The Entity Liability Agreement reads:

> **(C) Entity Liability (Elective)**
>
> If Entity Liability Coverage is included in ITEM 5 of the Declarations, the Insurer shall pay **Loss** on behalf of an **Insured Entity** resulting from an **Entity Claim** first made against such **Insured Entity** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by an **Insured Entity**.
>
> This Insuring Agreement shall be subject to the Entity Liability Coverage Retention and Prior or Pending Date in ITEM 5 of the Declarations.

D&O Coverage Part, § I(C) at p. 1

54.     Plaintiff HMI—a **Subsidiary** of Plaintiff QSC—is an **Insured Entity**.

> • **"Insured Entity"** means:
>   (1) the **Named Entity**; or
>   (2) any **Subsidiary**.

Policy, § II (Common Definitions) at p. 2

> I.   **COMMON TERMS AND CONDITIONS**, section **II. COMMON DEFINITIONS,** the definition of **Subsidiary,** is amended to include the following entity: Windsor Parent, LP; AMS GP, LLC; HM International LLC

Policy, Endorsement No. 8 at p. 1

55.     An **Entity Claim** — e.g., a "written demand for money damages or other civil non-monetary relief commenced by the receipt of such demand" — was made against Plaintiff

8

HMI on April 28, 2015 during the **Policy Period**. *See* Policy, Declarations at p. 1 (Policy Period runs from November 1, 2014 to November 1, 2015).

- **"Entity Claim"** means any:

    (1) written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand;

    (2) civil proceeding, including an arbitration or other alternative dispute proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

    (3) criminal proceeding commenced by the return of an indictment, or formal administrative or regulatory proceeding commenced by the filing of a notice of charges, or similar document;

    against an **Insured Entity**.

    **Entity Claim** also means a written request to an **Insured Entity** to toll or waive a statute of limitations regarding a potential **Entity Claim** as described above. Such **Claim** shall be commenced by the receipt of such request.

D&O Coverage Part, § II (Definitions) at p. 3

56. Although Plaintiff HMI denies that it has done anything that would qualify as a **Wrongful Act**, the **Entity Claim** made against Plaintiff HMI is based on Plaintiff HMI's allegedly **Wrongful Acts** — e.g., Plaintiff HMI's alleged actions and inactions.

- **"Wrongful Act"** means any actual or alleged:

    (1) error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed by an **Insured Person** in their capacity as such or in their **Outside Capacity**, or, with regard to Insuring Agreement (C) an **Insured Entity**; or

    (2) matter claimed against an **Insured Person,** solely by reason of their serving in such capacity, including service in an **Outside Capacity.**

D&O Coverage Part, § II (Definitions) at p. 5

57. Because a written demand for money damages (an **Entity Claim**) was made against Plaintiff HMI (an **Insured Entity**) on April 28, 2015 (falling in the **Policy Period**) for the January 12, 2015 transfer (the alleged **Wrongful Act**), Defendant is obligated to pay Plaintiff QSC and Plaintiff HMI's resulting **Loss**. D&O Coverage Part, § I(C).

58. Covered **Loss** includes **Damages** and **Defense Costs**.

9

- **"Loss"** means **Defense Costs** and **Damages**.

Policy, § II (Common Definitions) at p. 2

- **"Damages"** means the amounts, other than **Defense Costs**, that the **Insureds** are legally liable to pay solely as a result of a **Claim** covered by this **Liability Coverage Part**, including:

  (1) compensatory damages;

  (2) settlement amounts;

  (3) pre- and post-judgment interest;

  (4) costs awarded pursuant to judgments;

  (5) regarding Insuring Agreement (D), **Investigation Costs**;

  (6) punitive and exemplary damages;

  (7) the multiple portion of any multiplied damage award; or

  (8) where permissible by law, and notwithstanding sub-paragraph (a) below, civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-2(g)(2)(B)).

  However, **Damages** shall not include:

  (a) taxes, fines or penalties imposed by law, including, without limitation, **Data Privacy Regulatory Expenses**;

  (b) non-monetary relief;

  (c) any other matters uninsurable pursuant to any applicable law; provided, however, that with respect to punitive and exemplary damages, or the multiple portion of any multiplied damage award, the insurability of such damages shall be governed by the internal laws of any applicable jurisdiction that most favors coverage of such damages; or

D&O Coverage Part, § II (Definitions) at pp. 1-2

10

- **"Defense Costs"** means:

    (1) reasonable and necessary legal fees and expenses including but not limited to e-discovery expenses, incurred in the defense or appeal of a **Claim**;

    (2) **Extradition Costs**; or

    (3) the costs of appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to furnish such bonds.

However, **Defense Costs** shall not include:

  (a) salaries, wages, remuneration, overhead or benefit expenses associated with any **Insureds**;

  (b) any fees, expenses or costs which are incurred by or on behalf of a party which is not a covered **Insured**; or

  (c) any fees, expenses or costs which were incurred prior to the date on which the Insurer received written notice of **Claim** from the **Insured**.

Policy, § II (Common Definitions) at pp. 1-2

59. Plaintiffs QSC and HMI incurred a **Loss** resulting from the **Entity Claim**. Specifically, Plaintiffs QSC and HMI are both exposed to **Damages** and have incurred **Defense Costs** including reasonable and necessary legal fees and expenses incurred in the defense of the **Entity Claim**. Further, the statute of limitations on any claims that Plaintiffs Gregory and Kathryn Geib may have against Plaintiffs QSC and HMI may not run before Plaintiffs QSC and HMI's statute of limitations under the Policy.

**B.     Plaintiffs' claims under the Crime Coverage Part.**

60. In denying Plaintiffs QSC and HMI's claims under the D&O Coverage Part, Defendant reserved its right to contend that coverage under the D&O Coverage Part may be excluded based on Defendant's assertion that Plaintiff Gregory Geib is an **Insured** under the Policy.

61. Regardless of whether Plaintiff Gregory Geib is an **Insured** under the D&O Coverage Part, Plaintiffs QSC and HMI are also and/or alternatively entitled to recover under the Crime Coverage Part.

62. Further, if Plaintiff Gregory Geib and/or his wife Plaintiff Kathryn Geib are **Insureds**, then the Geibs are also entitled to recover under the Crime Coverage Part.

**1)   Plaintiffs QSC and HMI's claims under the Crime Coverage Part.**

63. The CFT Agreement reads:

> **(E) INSURING AGREEMENT 5. - COMPUTER AND FUNDS TRANSFER FRAUD**
>
> The Insurer will pay for loss of and loss from damage to **Money**, **Securities** and **Other Property** following and directly related to the use of any computer to fraudulently cause a transfer of that **Money**, **Securities** and **Other Property** from inside the **Premises** or **Banking Premises**:
>
> (1) to a person (other than a **Messenger**) outside those **Premises**; or
>
> (2) to a place outside those **Premises**.
>
> And, the Insurer will pay for loss of **Money** or **Securities** through **Funds Transfer Fraud** resulting directly from **Fraudulent Transfer Instructions** communicated to a **Financial Institution** and instructing such institution to pay, deliver, or transfer **Money** or **Securities** from an **Insured's Transfer Account**.

Crime Coverage Part, § I(E) at p. 2

64. Plaintiff HMI — a **Subsidiary** of QSC — is an **Insured Entity**. Policy, § II (Common Definitions) at p. 2; Policy, Endorsement No. 8 at p. 1.

65. An unknown person or entity used a computer to access the company's computer system and forge and intercept emails from and to Plaintiff Gregory Geib, and via this use of a computer fraudulently caused Plaintiff HMI to transfer $1,000,000 (**Money** or **Securities**) from the JPMorgan Chase bank account (**Banking Premises**) to Amlear LLC (person outside those **Premises**) via its fraudulent Bank of America bank account in Greenville, South Carolina (place outside those **Premises**).

> - **"Money"** means currency, coins and bank notes in current use and having a face value; and travelers checks, register checks and money orders held for sale to the general public.

Crime Coverage Part, § IV (Definitions) at p. 6

- **"Securities"** means negotiable or non-negotiable instruments or contracts representing either **Money** or **Other Property** and includes tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use and evidences of debt issued in connection with credit or charge cards, which cards are not issued by an **Insured**. However, **Securities** do not include **Money**.

Crime Coverage Part, § IV (Definitions) at p. 7

- **"Banking Premises"** means the interior portion of that part of any building occupied by a banking institution or similar safe depository.

Crime Coverage Part, § IV (Definitions) at p. 3

66. Amlear LLC—the fraudulent recipient—is not a **Messenger**.

- **"Messenger"** means an **Insured**, any of the **Insured's** partners or members or any **Employee** while having care and custody of **Money, Securities** and **Other Property** outside the **Premises**.

Crime Coverage Part, § IV (Definitions) at p. 6

67. The General Conditions of the Crime Coverage Part explain that the CFT Agreement covers **Money** or **Securities** for which the **Insured** is legally liable. An **Insured** includes any **Insured Entity**—here, Plaintiff HMI.

**(K) OWNERSHIP OF PROPERTY; INTERESTS COVERED**

(1) The property covered under this **Non-Liability Coverage Part** is limited to **Money, Securities** or **Other Property**:

    (a) that an **Insured** owns or leases; or

    (b) owned by an **Insured's** client and which the **Insured** holds on its **Premises** or which is in the custody of one acting as the **Insured's Messenger** and while such **Money, Securities** or **Other Property** is in transit; or

    (c) for which an **Insured** is legally liable excepting loss of client **Money, Securities** or **Other Property** occurring on such client's premises.

(2) However, this **Non-Liability Coverage Part** is for the **Insureds'** benefit alone and no other person or organization has any rights or benefits. Any claim for a loss of client **Money, Securities** or **Other Property** occurring on an **Insured's Premises** or while in transit in the custody of a **Messenger** may only be made by an **Insured** in its proof of loss.

Crime Coverage Part, § VI (General Conditions) at p. 14

- **"Insured(s)"** shall mean any **Insured Entity** or, solely under Insuring Agreement 8, an **Identity Recovery Insured**.

Crime Coverage Part, § IV (Definitions) at p. 6

68. The Demand Letter does not refer to any specific cause of action, but implies that Plaintiff HMI is legally liable for the $1,000,000 regardless of fault.

69. Although Plaintiffs Gregory and Kathryn Geib are Plaintiff HMI's clients, the $1,000,000 was at JPMorgan Chase (**Banking Premises**) and not on the Geibs' premises.

70. Because the loss of the $1,000,000 (**Money** or **Securities**) followed and was directly related to the unknown person's or entity's use of a computer to fraudulently cause a transfer of that $1,000,000 (**Money** or **Securities**) from inside the JPMorgan Chase bank account (**Banking Premises**) to Amlear LLC (a person outside those **Premises**) via Amlear LLC's fraudulent Bank of America bank account in Greenville, South Carolina (a place outside those **Premises**), Defendant is obligated to pay for the loss of the unrecovered part of the $1,000,000. Crime Coverage Part, § I(E).

**2) Plaintiffs Gregory and/or Kathryn Geib's claims under the Crime Coverage Part.**

71. If Plaintiff Gregory Geib and/or Plaintiff Kathryn Geib are **Insureds** under the Policy, the Geibs are also entitled to recover under the Crime Coverage Part.

72. As explained above, the loss of the $1,000,000 (**Money** or **Securities**) followed and was directly related to the unknown person or entities use of a computer to fraudulently cause a transfer of that $1,000,000 (**Money** or **Securities**) from the JPMorgan Chase bank account (**Banking Premises**) to Amlear LLC (person outside those **Premises**) via Amlear LLC's fraudulent Bank of America bank account in Greenville, South Carolina (place outside those **Premises**), and therefore Defendant is obligated to pay for the loss of the unrecovered part of the $1,000,000. Crime Coverage Part, § I(E).

73. Further, the CFT agreement states:

> And, the Insurer will pay for loss of **Money** or **Securities** through **Funds Transfer Fraud** resulting directly from **Fraudulent Transfer Instructions** communicated to a **Financial Institution** and instructing such institution to pay, deliver, or transfer **Money** or **Securities** from an **Insured's Transfer Account**.

Crime Coverage Part, § I(E) at p. 2

74. The unknown person or entity forged fraudulent electronic instructions (**Fraudulent Transfer Instructions**) that were communicated to JPMorgan Chase (**Financial Institution**) instructing JPMorgan Chase to transfer $1,000,000 (**Money** or **Securities**) from the JPMorgan Chase bank account (**Insured's Transfer Account**).

- "**Fraudulent Transfer Instructions**" means:
    (1) fraudulent electronic, telegraphic, facsimile, cable, teletype or telephone instructions to a **Financial Institution** to debit a **Transfer Account** and to pay, transfer or deliver **Money** or **Securities** from such account and which instructions purport to have been authorized by an **Insured** but which have been fraudulently transmitted by another; or
    (2) fraudulent written instructions to a **Financial Institution** to debit a **Transfer Account** and to pay, transfer or deliver **Money** or **Securities** from such account through an electronic funds transfer system at specified times or under specified conditions and which instructions purport to have been duly authorized by an **Insured** but which have been fraudulently issued, forged or altered by another.

Crime Coverage Part, § IV (Definitions) at p. 5

- "**Financial Institution**" means a bank, savings bank, savings and loan association or similar thrift institution, a stockbroker, mutual fund, liquid assets fund, or similar investment institution in which an **Insured** maintains a **Transfer Account**.

Crime Coverage Part, § IV (Definitions) at p. 5

- "**Transfer Account**" means an account maintained by an **Insured** at a **Financial Institution** from which the **Insured** or its authorized representative may cause the payment, transfer or delivery of **Money** or **Securities** by any means described in the **Fraudulent Transfer Instructions** definition.

Crime Coverage Part, § IV (Definitions) at p. 7

75. If Plaintiff Gregory Geib and/or Plaintiff Kathryn Geib are **Insureds** under the Policy, Defendant is also obligated to pay for the loss of Money and Securities through the Funds Transfer Fraud explained above.

- "**Funds Transfer Fraud**" means **Theft** of **Money** or **Securities** from any of the **Insureds' Transfer Accounts** at a **Financial Institution** and occurring through **Fraudulent Transfer Instructions** communicated to such **Financial Institution**.

Crime Coverage Part, § IV (Definitions) at p. 5

76. Defendant breached the Policy at least by failing to meet any one of the obligations under the Policy as outlined above.

77. Defendant's breach caused one or more of Plaintiffs' damages, including at least:

15

    a)    Plaintiffs QSC and/or HMI's **Damages** and **Defense Costs**, interest as allowed under the terms of the Policy, reasonable and necessary attorneys' fees incurred in pursing this claim, and court costs;

    b)    Plaintiffs QSC and/or HMI's loss of and/or loss from damage to **Money** or **Securities** in an amount exceeding $500,000, interest on this amount as allowed under the terms of the Policy, reasonable and necessary attorneys' fees incurred in pursing this claim, and court costs; and/or

    c)    Plaintiffs Gregory and/or Kathryn Geib's loss of and/or loss from damage to **Money** or **Securities** in an amount exceeding $500,000, interest on this amount as allowed under the terms of the Policy, reasonable and necessary attorneys' fees incurred in pursing this claim, and court costs.

    **II.**    **BAD FAITH GENERALLY UNDER TEX. INS. CODE § 541**

78. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

79. Having determined that the Policy was in force and effect at the time of the occurrence described above, Plaintiffs timely and properly noticed Defendant of the occurrence and/or **Loss**. Plaintiffs fully complied with all the conditions of the insurance policy before bringing this suit. Nevertheless, Defendant has failed and refused, and still fail and refuse to Plaintiffs, the benefits due under the Policy, as Defendant is contractually required to do. These acts and practices are in violation of Chapter 541 of the Texas Insurance Code, including Tex. Ins. Code § 541, Subchapter B.

    **III.**    **COMMON LAW BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

80. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

81. Plaintiffs QSC and HMI and Defendant has an insurance contract between them — the Policy — that creates a duty on the part of Defendant to deal fairly and in good faith with insureds like Plaintiffs QSC and HMI in the processing of claims.

82. To the extent that Plaintiffs Gregory and/or Kathryn Geib are **Insureds**, Defendant likewise has an insurance contract between them — the Policy — that creates a duty

16

on the part of Defendant to deal fairly and in good faith with insureds like Plaintiffs Gregory and Kathryn Geib in the processing of claims.

83. Defendant breached its duty when Defendant knew, or should have known, that coverage of the one or more of Plaintiffs' claims, and thus, liability for payment of those claims, was reasonably clear under the Policy.

84. No reasonable basis exists for denying payment of one or more of Plaintiffs' claims because one or more of Plaintiffs' claims are covered by the Policy. For example, as explained above, it is clear from a review of the Policy that coverage arises under the Entity Liability Agreement and/or the CFT Agreement.

85. Defendant's breach proximately caused Plaintiffs' damages.

    IV.    UNFAIR SETTLEMENT PRACTICES UNDER TEX. INS. CODE § 541

86. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

87. Defendant's refusal to pay and denial of coverage on Plaintiffs' claim is in bad faith, both under the Texas common law and under the Texas Insurance Code. Defendant is liable to Plaintiffs for unfair settlement practices because Defendant:

    a) failed to attempt in good faith to effectuate a prompt, fair and equitable settlement of a claim with respect to which Defendant's liability has become reasonably clear; and

    b) refused to pay a claim without conducting a reasonable investigation with respect to the claim to settle the claim when coverage is reasonably clear.

88. In a lawsuit filed under the aforementioned subchapters of the Texas Insurance Code, in particular § 541 *et seq.*, Plaintiffs may obtain:

    a) actual damages, plus court costs and reasonable and necessary attorney's fees;

    b) on a finding by the trier of fact that Defendant knowingly committed the act(s) complained of, an amount not to exceed three (3) times the actual damages; and

    c)    any other relief which the Court deems proper.

89.    Defendant's conduct was a producing cause of Plaintiffs' damages.

## ATTORNEYS' FEES

90.    Plaintiffs have been required to engage the services of the undersigned attorneys to represent them in this case. Accordingly, this suit is maintained against the Defendant for reasonable attorneys' fees for the services expended and to be expended in the presentation of Plaintiffs' claims though the trial court and at all levels in the appellate process. All conditions precedent necessary for the recovery of attorneys' fees by Plaintiffs have been fulfilled.

## PUNITIVE DAMAGES

91.    Upon information and belief, the actions of the Defendant were undertaken willfully and maliciously. Upon information and belief, Defendant intentionally committed these wrongful acts and its actions were motivated by malice. Accordingly, Plaintiffs are entitled to recover punitive damages.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request the following relief:

    a)    Actual damages in an amount exceeding the minimum jurisdictional limits of this Court;

    b)    Statutory damages in the amount of three (3) times the actual damages pursuant to Tex. Ins. Code § 541.152(3)(c);

    c)    Punitive damages

d) Reasonable and necessary attorneys' fees (including fees in responding to an unsuccessful appeal by Defendant) pursuant to Tex. Ins. Code § 541.152(1);

e) Pre-judgment interest at the highest legal rate;

f) Post-judgment interest at the highest legal rate;

g) Taxable Court costs; and

h) Such other and further relief, general or special, at law or in equity, to which the Court finds Plaintiffs justly entitled.

Dated: January 13, 2017

Respectfully submitted,

**KLEMCHUK LLP**

/s/ *Aaron D. Davidson*
Aaron D. Davidson
Texas State Bar No. 24007080
aaron.davidson@klemchuk.com
Timothy J.H. Craddock
Texas State Bar No. 24082868
tim.craddock@klemchuk.com
8150 N. Central Expressway, 10th Floor
Dallas, TX 75206
P. 214.367.6000
F. 214.367.6001

**ATTORNEYS FOR PLAINTIFFS QUALITY SAUSAGE COMPANY, LLC AND HM INTERNATIONAL, LLC**

**THE WOLF LAW FIRM, P.C.**

/s/ *Jeffrey J. Wolf*
Jeffrey J. Wolf
Texas State Bar No. 21849012
jwolf@wolflawpc.com
1360 N. White Chapel Blvd
Southlake, TX 76092
P. 817.552.9653
F. 817.552.0300

**ATTORNEY FOR PLAINTIFFS GREGORY R. GEIB AND KATHRYN M. GEIB**